No. 84-23

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

PHYLLIS EDINGTON and BOW VALLEY
PETROLEUM, INC., and FLARE ENERGY
CORPORATION,

Plaintiffs and Appellants,

vs.

CREEK OIL COMPANY, a Wyoming Corp.,
and LOUIS BIBY,

Defendants, Cross-Complainants,
and Cross-Appellants,

and

SIGNAL DRILLING CO., et al.,

Defendants.

---

APPEAL FROM: District Court of the Seventh Judicial District,
In and for the County of Richland,
Honorable R. C. McDonough, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Habedank, Cumming, Best and Maltese, Sidney,
Montana
Otto T. Habedank argued and  Robert J. Savage
argued, Sidney, Montana

For Defendants-Cross-Appellants:

James R. Carlson, Jr., argued, Hysham, Montana

---

Submitted:  June 4, 1984

Decided:  October 29, 1984

Filed: OCT 29 1984

<u>Ethel M. Harrison</u>
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

In this case the District Court, Seventh Judicial District, Richland County had before it the question which of two oil and gas leases was legally in effect as to production from an oil well under the leases from and after December 1980.

On February 2, 1962, Phyllis Edington entered into an oil and gas lease with John W. Batts covering mineral interests owned by her in Richland County, Montana. During the primary term of the lease a producing well was drilled. The working interest in the well was assigned by Batts to Creek Oil Company which operated and produced the well until July 1973. Production was stopped at that time by an order of the Montana Oil and Gas Commission because of saltwater seepage from a saltwater deposit pit at the well site. The trial court, in its findings of fact, found that solving the problem of saltwater seepage was within the reasonable control of Creek Oil Company. The remedy was sealing the leakage with a truckload of mud which was available. Creek Oil Company did not resume production of the well within 90 days after its cessation pursuant to paragraph 8(c) of the Edington Lease, to-wit:

> "In the event of cessation of production and operations hereunder after the primary term thereof, the lessee shall have a period of ninety (90) days within which to resume operations or production, and if operations or production are resumed within such time, then this lease shall continue in force as if there had never been any interruption in the operations or production, that is subject only to limitations set forth in Section 2 hereof."

Section 2:

"Subject to the further provisions hereof, this lease shall remain in force for a term of 5 years from this date, called 'Primary Term' and as long thereafter as either (1) oil, gas, or other minerals are produced (whether or not in paying quantities) from the leased premises, or (2) operations are conducted on the leased premises, or (3) there is a well or wells on the leased premises, which, although capable of producing oil, gas, or other minerals in paying quantities hereunder is shut in for lack of a market or outlet.

"Operations as used herein means all operations for the drilling of a well for oil or gas, including building of roads, preparation of the drill site, moving in for drilling, drilling, deepening, plugging back, reworking or recompleting and also secondary recovery operations benefiting the leased premises."

On December 12, 1974, Phyllis Edington executed a second oil and gas lease to Wendell H. Elliott, which lease was recorded in the records of Richland County. On May 2, 1980, Phyllis Edington executed a further oil and gas lease to Mountain & Plains Company which lease was recorded on May 2, 1980, in the records of Richland County. Mountain & Plains Company assigned its lease to Bow Valley Petroleum, Inc. on May 13, 1980, and this assignment was also recorded in the county records.

In December 1980, Creek Oil Company and Louis Biby entered the lands and resumed production of the oil well.

On November 18, 1981, Bow Valley assigned one-half of its leasehold right, title and interest under its lease to Flare Energy Corporation. That assignment was also duly recorded.

Edington, Bow Valley Petroleum, Inc., and Flare Energy Corporation, as plaintiffs, filed an action to quiet title, in effect, to the oil produced from the lands after December 1980, and in due course, trial was had in January 1983. On April 6, 1983, the District Court entered its first findings

of fact, conclusions of law, and order. The District Court held that the lease had terminated under its express provisions in October 1973, and that, by re-leasing her property to Elliott, Edington had asserted an interest in the property of record which was adverse to that claimed by the defendants. The court also held that the mineral ownership of Edington and the leasehold interest of Bow Valley Petroleum, Inc. and Flare Energy Corporation are superior to any claimed interest of Creek Oil and Biby, whose claims are without any right whatever. The court also ruled that the defendants had no right, title, or interest in the minerals under the lands. However, the District Court found that Creek Oil Company and Biby were entitled to 87½% of the production from the well from December 1980 to the date of his order. Later the District Court amended that determination to entitle defendants Creek Oil Company and Biby to 87½% of all production of the well up to and including January 26, 1983, the date the trial in the District Court ended.

The court also ruled, on April 6, 1983, that the casing in the well is the property of Bow Valley Petroleum, Inc. and Flare Energy Corporation, but that said Bow Valley Petroleum, Inc. and Flare Energy Corporation must pay to Biby and Creek Oil Company the present value of said casing less the cost of removal. After a further hearing, the District Court ruled that Bow Valley and Flare Energy should pay Creek Oil and Biby the sum of $5,250, which represents the present value of the casing less the cost of removal.

Both parties appeal from the judgment of the District Court. Plaintiffs Phyllis Edington and Bow Valley Petroleum, Inc. appeal on the following issues:

1. That the defendants, Creek Oil Company and Biby, were bad faith trespassers on December 1980, when they resumed oil production of the subject well.

2. That Creek Oil Company and Biby are not entitled to any share of the production or cost of production because of their bad faith trespass in December 1980, nor are they entitled to credit for expenses incurred or deduction of costs of production.

3. There is insufficient evidence to support the trial court's findings that $5,250 represents the present value of the casing less its cost of removal.

Creek Oil Company and Louis Biby cross-appeal and raise the following issues:

1. The District Court failed to give effect to the force majeure clause of the lease.

2. The District Court failed to give effect to the judicial ascertainment clause of the lease.

3. The judgment of the District Court unduly enriches Bow Valley, Inc.

4. There is insufficient evidence to support the essential findings of the District Court.

5. The court should not have permitted the use of the discovery deposition of Mrs. Edington at the trial.

FORCE MAJEURE

The force majeure clause in the lease, under which Creek Oil and Biby claim their interests, provides:

"17. This lease shall not expire, terminate or be forfeited in whole or in part nor shall lessee be liable in damage for failure of lessee to comply with any express or implied covenants hereunder so long as compliance herewith is hindered, delayed, prevented or interrupted by force majeure. The term 'force majeure' as used herein shall mean and include state and federal statutes, all orders, rules and regulations of any governmental body

- 5 -

(either federal, state or municipal) fire, storm, flood, war, rebellion, riots, strikes, differences with workmen, acts of God, breakage or failure of machinery or equipment, inability to obtain material or equipment or the authority to use the same (after effort in good faith), failure of pipe lines normally used to transport or furnish facilities for transportation or any other cause (whether similar or dissimilar) beyond the reasonable control of lessee." (Emphasis added.)

Creek Oil and Biby maintain that the order of the Montana Oil and Gas Commission in July 1973, which suspended production of oil under their lease, is covered by the force majeure clause and that thereby the lease cannot be terminated for their failure to comply with any express or implied covenants of the lease. They claim that the force majeure clause has the effect of suspending termination provisions contained in paragraph 8(c), quoted above, and that their only responsibility, once the well was shut in, was to exercise due diligence in returning the well to production. They further contend that economic factors material to the question of reasonable diligence should be considered, including the cost of disposing of the saltwater and the market price of the crude oil at the time.

Edington and Bow Valley, on the other hand, contend that the underlying reason for the State Oil and Gas Commission order to shut in the well was the defendants own wrongdoing in permitting saltwater seepage and therefore the force majeure clause does not apply. They point out that substantial evidence in the record supported the court's findings that Creek Oil could reasonably solve the saltwater problem, that Edington lost royalty payments for over seven years by their suspension of production, and that Creek Oil and Biby suspended production of oil for economic reasons and not for reasons covered by the force majeure clause.

It is obvious that the purpose of the _force majeure_ clause in this oil and gas lease was to relieve the lessees from harsh termination of the lease due to circumstances beyond control of the lessees that would make their performance under the lease untenable or impossible. The _force majeure_ clause, if applicable, would have the effect of suspending the clause for termination by reason of cessation of operations. 4 Williams, _Oil and Gas Law_, § 683.2 at 392, suggests that the effect of the _force majeure_ clause in an oil and gas lease is to amend a paragraph such as 8(c) to read: "upon failure of production during the secondary term, unless such failure was due to _force majeure_."

The District Court made findings of fact that the Montana Oil and Gas Commission would have allowed further production of the subject well if Creek Oil had sealed the saltwater pit; that Creek Oil could have corrected the problem of leakage with a truckload of mud which was available; that a natural saltwater seep existed where Creek Oil had located its saltwater bit and Creek Oil did not make a request to the Commission for a variance to allow the saltwater to seep to the natural pit; that solving the problem was reasonably possible and within the control of Creek Oil. These findings are supported in the record and bind this Court unless clearly erroneous. Rule 54(b), M.R.Civ.P. We do not find the court in error.

In applying the law, the District Court determined that the _force majeure_ clause did not apply because the problem which caused the well to be shut in, and its solution, were not beyond the control of Creek Oil and Biby. Wilson v. Talbert (Ark. 1976), 535 S.W.2d 807. See Hixson v. Parker (Ark. 1957), 307 S.W.2d 210.

- 7 -

Under the findings, the District Court properly applied the law to the _force majeure_ clause here. Where the action of the governmental unit to shut in the well, as in this case, is brought about and continued in force by the wrongful or improper action of the lessees, they cannot rely on the _force majeure_ clause to escape the other termination provisions of the oil and gas lease. The _force majeure_ clause is not an escape way for those interruptions of production that could be prevented by the exercise of prudence, diligence, care, and the use of those appliances that the situation or party renders it reasonable that he should employ. Jutte v. The George Shiras (3rd Cir. 1894), 61 F. 300. The other contentions of Creek Oil and Biby respecting the _force majeure_ clause are without merit.

## THE JUDICIAL ASCERTAINMENT CLAUSE

The oil and gas lease held by Creek Oil Company contained a judicial ascertainment clause. Such clauses vary from lease to lease, and from jurisdiction to jurisdiction, according to the practice of those in the industry. In this case the judicial ascertainment clause was stated in paragraph 14:

> "14. This lease shall never be forfeited or cancelled for breach of implied covenant until it shall have been finally judicially determined that such breach exists and lessees shall have failed within a reasonable time of such final determination, to remedy such breach."

Creek Oil Company and Biby contend that the obligation, if any, of lessees under the lease to cure the saltwater seepage problem was an implied covenant; that it was the duty of the lessors, before the lease could be terminated or cancelled, to proceed through court for a determination that a breach of covenant actually existed; and after such

- 8 -

determination that Creek Oil Company and Biby were entitled to a reasonable time to remedy such breach. Since the lessors did repair to court proceedings in this case, Creek Oil Company and Biby contend that their oil and gas lease is still in effect because there has been no judicial ascertainment of a breach of an implied convenant.

This particular oil and gas lease does not contain a notice provision for termination of the lease by lessors in the case of a breach of an implied covenant under the lease. Creek Oil Company and Biby, however, equate the judicial ascertainment clause with a notice clause and contend that we should apply the same rule with respect to the judicial ascertainment clause in this case that was applied in Christian v. A. A. Oil Company (1973), 161 Mont. 420, 506 P.2d 1369, relating to a failure to give notice.

The District Court determined that the 90 day cessation of production clause was an express covenant and as such the judicial ascertainment clause did not apply to it.

It is beyond cavil, from the plain language of the lease, that the judicial ascertainment clause applies only to breaches of implied covenants of the lease. See Eitel v. Alford (Colo. 1953), 257 P.2d 955.

For most purposes, courts construe oil and gas leases under the rules of contract interpretation. 2 Summers, The Law of Oil and Gas (1959), Ch. 12, § 371, at 484, et seq.

This oil and gas lease had extended beyond its primary term of 5 years. Because a producing oil well had been completed by the lessees under their lease, leasehold rights vested in the lessees for a secondary term as long as (1) oil and gas or other minerals were produced (whether or not in paying quantities) from the lease premises; or (2) operations

- 9 -

were conducted by lessees on the leased premises; or (3) there was a well or wells on the leased premises that, although capable of producing oil and gas or other minerals in paying quantities thereunder, is or were shut in for lack of a market or outlet.

Paragraph 8(c) of the oil and gas lease provided a limitation on that leasehold estate and term, however. In the event of "cessation of production and operations" after the primary term of the lease, the lessee is given a period of 90 days in which to resume operations or production and, if resumed within the 90 days, the lease would continue in force as if there had never been any interruption in the operations or production.

In their leasehold estate under the oil and gas lease, therefore, lessees had the contractual duty not to cease either production or operations for a period of more than 90 days. Their duty of production of minerals or the conduct of operations was an express condition for the continuance of the leasehold estate. When, as it clearly appears here, lessees allowed the production to cease and operations not to be conducted for a period of more than 90 days, their oil and gas lease terminated and ended by its own terms. McQueen v. Santa Oil Company (6th Cir. 1954), 213 F.2d 889.

In Hall v. McWilliams (Tex. Civ. App. 1966), 404 S.W.2d 606, where a producing well was shut down because the lessees' saltwater permit was suspended by governmental action, no production occurred, and no drilling or reworking operations were conducted for a period of more than 60 days the Texas court held that the lease had terminated under its own terms (that lease contained a 60 day provision). The

court said it could not be held to be a "temporary" stoppage where the cessation of production lasted more than 60 days.

We determine that under the facts of this case, the judicial ascertainment clause was not called into effect and that, because of the cessation of production and lack of conduct of operations by the lessees on the leased premises for a period of 90 days, the Creek Oil Company and Biby lease terminated by its own provisions. The lessees had no leasehold estate upon which to rely when they reentered the premises to produce oil in December 1980.

INNOCENT V. WILLFUL TRESPASS

The District Court found that Creek Oil Company and Biby were good faith trespassers until the time of trial, January 26, 1983, and thereafter bad faith trespassers. The District Court found as facts that the Creek Oil Company and Biby acted in good faith, their entry and possession were peaceful, and they had acted in an honest belief up to and including the trial of the action. The District Court found that at the trial, the defendants became aware of all the facts that constituted their claims as well as the facts upon which the plaintiffs based their claims and consequently, subsequent to January 26, 1983, in producing said well have acted as a trespassers in bad faith.

The District Court also found that the equipment on the well site when production was discontinued in 1973 was in a state of disrepair. Louis Biby, on behalf of the defendants, prior to December 1980, made substantial expenditures of time and money including $269,000.00 for permanent improvements to the well.

Based on its finding of good faith to the time of trial, the District Court prorated the gross value of all oil sold from the well through March 1983 as follows:

| | |
|---|---|
| Phyllis Edington (12½%) | $ 16,062.98 |
| Creek Oil and Biby | 82,207.16 |
| Bow Valley Petroleum | 30,233.66 |
| TOTAL | $128,503.80 |

Bow Valley appeals from the order of the District Court with respect to its share of the production, contending that Creek Oil and Biby were bad faith trespassers from and after December 1980, and are entitled to no recompense for the cost of production nor from the proceeds of the oil. Also, that Bow Valley and Flare Energy should be awarded the full value of the working interest proceeds from the oil, subject to a 5% overriding royalty to Mountain & Plains Oil Company.

The argument of Bow Valley respecting the distribution of the proceeds arises from a difference in the measure of damages based on whether Creek Oil Company and Biby were in good faith or bad faith in trespassing upon the leased premises as explained by Sullivan, Handbook of Oil and Gas Law, at 58 and 59:

> "In the case of good faith trespassers the measure of damages that must be paid is the value of the oil and gas in place. Because of the difficulty in proving such value in place, courts have adopted the measure as being the value of the petroleum at the surface, whether in tank or pipeline, less the reasonable cost of production. The costs of production include the cost of drilling and equipping the well in addition to the expense of bringing it to the surface . . .
>
> "Where the trespass has been made in bad faith, no deduction is allowed for the cost of production. The proper measure of damages in such a case is the value of the petroleum at the surface . . ."

Important to this discussion is the finding of the District Court that the Creek Oil Company and Biby first became aware of all the facts which constitute their claim

- 12 -

and the facts which constitute the plaintiff's claim at the trial of the action. Bow Valley disputes this finding, claiming that, from the evidence before the District Court, Creek Oil Company and Biby had actual and constructive notice that their lease had terminated.

It is certain that Creek Oil Company and Biby had constructive notice of the recorded instruments, including oil and gas leases and assignments, that were given by Edington, and those acting under her, after Creek Oil Company ceased production in 1973 and before production was resumed in December 1980. We have recited in the first part of this opinion those particular instruments.

Bow Valley further claims that Creek Oil Company and Biby had actual notice of the claims of Bow Valley and its subsequent assignees. In particular they point to the provisions of the agreement between Creek Oil Company and Biby, constituting Creek Oil's proposal for resumed production on the premises, which was expressly made subject to a "favorable resolution of the top lease" given by the royalty owner. Creek Oil Company's president was aware on December 4, 1976 that Edington had issued the first lease which expired after a two year term. On June 7, 1977, Edington's attorney wrote to Creek Oil Company their contention that the Creek Oil Company lease had expired under its own terms.

Of equal weight in determining that Creek Oil Company and Biby were aware that their lease had terminated is the language of their own oil and gas lease, with the specific provisions in it for termination upon cessation of production for 90 days. It seems impossible that they could have an

honest and reasonable belief in the superiority of their title. Sullivan, Handbook of Oil and Gas Law, at 58.

The controlling case in this situation is Reickhoff v. Consolidated Gas Company (1950), 123 Mont. 555, 217 P.2d 1076. In that case, Consolidated drilled a gas well on lands on which Reickhoff held a valid oil and gas lease. Consolidated had commenced an action against Reickhoff and others seeking to quiet title to the real estate and minerals and the District Court had entered its order or decree in favor of Consolidated. Reickhoff was inducted into the U.S. Army the day before the decree was filed. Consolidated, upon entry of the decree, went on the leased lands, removed Reickhoff's oil drilling rig, set up its own rig, and started drilling. Reickhoff appealed the District Court decision to the Montana Supreme Court and the judgment in favor of Consolidated was reversed. Consolidated Gas Co. v. Reickhoff (1944), 116 Mont. 1, 151 P.2d 588. Thereafter Reickhoff sought recovery from Consolidated for the value of the gas it had produced from the well and claimed that Consolidated was a bad faith trespasser. In finding the trespass willful this Court said:

> ". . . That the company was a trespasser on the leased lands is beyond doubt. But the company says it was not a willful trespasser for it entered under the district court's decree, assuming to annul the lease and to quiet title in it. However, it knew the law gave to Reickhoff the right of appeal and that on such appeal the decree might be either reversed, modified, affirmed, or the case be sent back for the taking of further evidence or a new trial. It knew Reickhoff had vigorously fought the suit and that he was likely to appeal from the judgment entered against him. In misjudging the law and Reickhoff the gas company acted at its peril. It assumed the attendant risk of drilling the well on the lands leased to Reickhoff and of having the trial court's judgment reversed on appeal, but it took the chance and lost.
>
> ". . .

- 14 -

"   . . . 'Why should one be treated as acting in good faith when dealing with property as his own, when he knows all of the facts which constitute his claim, as well as the claims of his adversary, which facts, when properly construed, give him no title to the land?  Such a holding would make every man a judge of the law in his own case, instead of being bound by the law as interpreted by those charged with that duty.  We must therefore conclude that the defendants, when they drilled the wells on these lands, were willful trespassers, just as much so as though there had been no question but that the plaintiffs had the superior right.  They could not decide the disputed question in their own favor, and then proceed with the hope that their acts would be characterized by this Court as in good faith, even though their judgment upon the law of the case should not be approved.'"   (Citations omitted.)   Reickhoff v. Consolidated Gas Co. (1950), 123 Mont. 555, 562, 563, 217 P.2d 1076, 1079, 1080.

Reickhoff is applicable to this case.  Creek Oil Company and Biby were willful trespassers when they entered upon the lands for which their oil and gas lease had expired to recommence drilling operations.  As willful trespassers they are not entitled to recover either proceeds from the oil produced or the cost of producing the oil.  The District Court was clearly erroneous in finding good faith up to the time of trial.  Rule 54(b), M.R.Civ.P.

Creek Oil Company and Biby further argue that in determining good faith we should take into account that they have never taken possession of the funds from the sale of the oil, that such funds have been deposited in court, and that the sale of the oil has been commercially reasonable.  They also argue that finding them bad faith trespassers would have the effect of unjustly enriching Bow Valley which has not done anything to produce the oil.

Yet, it is Bow Valley's right to the working interest in its lease that Creek Oil Company and Biby usurped, without any basis for relying on the superiority of the Creek Oil title to the leasehold interest.  Their essential act of

- 15 -

willful trespass was going upon the land to reproduce the well in the face of the provisions in their own lease that it had terminated for cessation of production. Creek Oil Company and Biby have continued to usurp Bow Valley's right to the working interest throughout the litigation. Preserving the proceeds does not ameliorate their bad faith trespass.

VALUE OF CASING

The District Court found that Creek Oil Company and Biby were entitled to receive from Bow Valley $5,250.00 as the present value of the casing in place in the oil well, less its costs of removal.

The District Court arrived at its figure by determining the present value of the 5,000 feet of casing at $3.75 per foot less the cost of removal, $2.70 per foot. In reaching this finding, the court admitted the evidence of value of the casing was "sketchy," that the casing was 17 years old, and the amount of removable pipe is speculative. Accordingly, Bow Valley argues that the decision of the District Court is speculative and conjectural and should be set aside.

This Court has approved the concept that in assessing damages, the trier of fact must exercise calm and reasonable judgment and the amount of the award rests of necessity in the sound discretion of the trier of fact. Johnson v. Murray (Mont. 1982), 656 P.2d 170, 175, 39 St.Rep. 2257. When there is strong evidence of the fact of damage, a defendant should not escape liability because the amount of damage cannot be proved with precision. Johnson, supra; Jarussi v. Board of Trustees of School District No. 28 (Mont. 1983), 664 P.2d 316, 318, 40 St.Rep. 720, 723. We have adopted the concept that a wrongdoer is not allowed to escape by merely paying

nominal damages if there is any reasonable way in which the amount that he should pay in damages can be determined. Therefore, if the damages are measured by a method which is reasonably definite, and not likely to give compensation in excess of the loss suffered, the damages will be approved. Laas v. Montana State Highway Commission et al. (1971), 157 Mont. 121, 131, 483 P.2d 699, 704. Although these rules of damages apply against wrongdoers, there is no reason why we should not apply the same rules here where it is undoubted that Creek Oil Company and Biby are entitled to recover for the present value of the casing less its costs of removal.

We hold that in view of the difficulty in ascertaining the value of the casing, the Court adopted a reasonable method and price for determining the damages based on the evidence of experts before it. We therefore affirm the award of the District Court with respect to the value of the casing.

## USE OF EDINGTON DEPOSITION

Creek Oil Company and Biby claim on appeal that it was improper for the District Court to allow the deposition of plaintiff Mrs. Phyllis Edington to be used at trial in her absence as a witness.

Creek Oil and Biby contend that the deposition of Mrs. Edington was taken as a "discovery deposition," that she is a resident of Sidney, Montana, where the trial was held, and that she was not "unavailable" for appearance as a witness as Rule 804(c)(15), M.R.Evid., requires.

Testimony in the case indicated that at the time of the trial Phyllis Edington was residing in Mesa, Arizona, and that she spent part of the time in Arizona and the remainder of the year in Sidney. At the time of the trial she was in

Arizona. The District Court permitted the use of her deposition under the terms of Rule 32(a)(3)(B). That rule provides:

> "The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
>
> " . . .
>
> "(B) That the witness is at a greater distance than 100 miles from the place of trial or hearing, unless it appears that the absence of the witness was procured by the party offering the deposition;. . ."

Under the record in this case, the District Court was clearly within the provisions of Rule 32(a), allowing the use of the deposition of Mrs. Edington, although she was a party to the action. No other distinction is made in the Montana Rules of Civil Procedure between depositions taken in discovery, and those intended to be used at trial. The provisions of Rule 804, M.R.Evid., are not applicable to the problem of the use of the Edington deposition. Rule 804 is directed to hearsay exceptions. It is Rule 32, M.R.Civ.P. that governs the use of depositions at trial. We find no error in the use of the Edington deposition.

DECISION

Affirmed in part and reversed in part, and remanded to the District Court for entry of judgment in accordance with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

- 18 -

John Conway Harrison

_(signature)_

_(signature)_

Daniel J. Shea

L. C. Gulbrandson.

Justices